IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

|  |  |  |
|---|---|---|
| **LEONARDO RAMOS LUCERO,** | * | |
| Petitioner | * | |
| v. | * | CIVIL NO. JKB-14-1919 |
| **UNITED STATES OF AMERICA,** | * | |
| Respondent | * | |

\* \* \* \* \* \* \* \* \* \* \* \*

## MEMORANDUM

Pending before the Court is Leonardo Ramos Lucero's petition for writ of habeas corpus (ECF No. 1), seeking review of the order entered on June 2, 2014, which certified Lucero's extradition to the United Mexican States ("Mexico") (14-mj-01009-BPG, ECF No. 7). The United States has filed its response in this case (Civ. No. JKB-14-1919, ECF No. 3), to which Petitioner filed no reply. No hearing is necessary. Local Rule 105.6 (D. Md. 2014). The petition will be denied.

Preliminarily, the Court notes Respondent has rightly pointed out that naming the United States as Respondent is incorrect under the federal habeas statute, which indicates that a writ or order to show cause is properly directed to "the person having custody of the person detained." 28 U.S.C. § 2243. The United States is not Petitioner's custodian. From the record, it appears that Lucero is presently detained in the Chesapeake Detention Facility, which is part of the Maryland state correction system. His present custodian, then, is Robert Koppel, who is warden of that facility. Because Respondent, in the interest of efficiency and economy, does not object to amendment of the petition to name the correct custodian (Mem. 3, ECF No. 3), the Court will order the docket to be amended to reflect Koppel as Respondent.

*I. Standard for Habeas Corpus Review of Extradition Certification Order*

It is well established that a fugitive has no direct appeal from an extradition judge's certification. *Collins v. Miller*, 252 U.S. 364, 369 (1920). The only means to obtain review of an extradition certification is to seek federal habeas relief. *Haxhiaj v. Hackman*, 528 F.3d 282, 285-86 (4th Cir. 2008). A habeas petitioner has the burden of proving, by a preponderance of the evidence, that he is being held contrary to federal law. *Johnson v. Zerbst*, 304 U.S. 458, 468-69 (1938); *Skaftouros v. United States*, 667 F.3d 144, 158 (2d Cir. 2011). The standard to be employed in this particular kind of habeas review was articulated by the Supreme Court in *Fernandez v. Phillips*, 268 U.S. 311 (1925):

> [The writ of habeas corpus] is not a means for rehearing what the magistrate already has decided. The alleged fugitive from justice has had his hearing and habeas corpus is available only to inquire whether the magistrate had jurisdiction, whether the offense charged is within the treaty and, by a somewhat liberal extension, whether there was any evidence warranting the finding that there was reasonable ground to believe the accused guilty.

*Id.* at 312; *Mironescu v. Costner*, 480 F.3d 664, 665-66 (4th Cir. 2007).

During an extradition hearing, the magistrate judge applies the same standard for probable cause employed in federal preliminary hearings, *i.e.*, "'whether there is competent evidence to justify holding the accused to await trial.'" *Haxhiaj*, 528 F.3d at 287 (citation omitted). But as the Supreme Court noted in *Fernandez*, "[c]ompetent evidence to establish reasonable grounds [to extradite] is not necessarily evidence competent to convict." 268 U.S. at 312. And a federal habeas court's review of the magistrate judge's probable cause determination "is *at least* as deferential, if not more so, than that applied to a magistrate judge's decision to issue a search warrant." *Ordinola v. Hackman*, 478 F.3d 588, 609-10 (4th Cir. 2007) (Traxler, J., concurring), *quoted in Haxhiaj*, 528 F.3d at 287.

## II. Evidence Supporting the Extradition Request

A brief summary of the crime underlying the extradition request, and the supporting evidence, will be helpful here. The summary is derived from the documents submitted by the Mexican government in furtherance of its extradition request; documents were submitted in Spanish and in an English translation. (14-mj-01009-BPG, ECF No. 10.)

According to the statement of Roxana Adelina Hinojosa Ramos ("Hinojosa Ramos"), in the evening hours of January 2, 2006, in Ensenada, Baja California, she went to a public park to meet her former boyfriend, Klaus Michael Aldama Perez ("Aldama Perez"), who was the father of her son. (*Id.* Ex. 7.) She had broken up with him after he cheated on her. Hinojosa Ramos and Aldama Perez walked to a playground in the park and talked, but he started yelling at her, accusing her of having a new companion. Hinojosa Ramos then left and, when she was about twenty meters from the playground, heard Aldama Perez shouting, "Help me, Roxana." She then saw someone wearing dark blue pants and a dark-colored jacket and running out of the playground. At the same time she saw her half-brother, Leonardo Ramos Lucero, coming toward her. He grabbed her arm and pulled her away from the playground, saying, "Let's go, let's go." Hinojosa Ramos then asked him what he did to Aldama Perez, and Lucero said, "Nothing, nothing happened, I just hit him." When she asked him why, Lucero said, "Because he deserved it, because he abused, do not go back, fuck him, let's go, and you know nothing, you have not seen me, and I am dead." Hinojosa Ramos described what her half-brother was wearing: black trousers, white sneakers, a dark-colored hat reading "LA," and off-white "sweating jacket with brown sleeves and brown cap, and some letters in the chest." Hinojosa Ramos said Lucero was wearing the "cap" over the hat; the Court infers the "cap" of the "sweating jacket" was a hood. Shortly after the incident in the park, Hinojosa Ramos was shown

3

an article of clothing by law enforcement personnel, and she identified it as "the same sweating jacket" worn by Lucero when she saw him in the park.

Hinojosa Ramos stated her family did not like Aldama Perez. Once, she was talking on the telephone with Aldama Perez and started arguing. Lucero was present, grabbed the telephone, and began arguing with Aldama Perez, telling him, "Be cool, man, stop fucking around, if the girl does not want to be with you any more, leave her, the hell, otherwise I shall fuck you." Hinojosa Ramos also stated that Lucero had been imprisoned for about eight months for the crime of car theft. She described him as "a very violent man and . . . a drug consumer for a long time." She stated that her father's name is Rafael Mendoza Orozco and her mother is Guadalupe Ramos Lucero.

Also in the park at the time of the killing were three juvenile males who provided witness statements to the police within a few hours after Aldama Perez was killed. The first, Francisco Geovany Arellano Almazan, stated that he saw a young man and young woman talking in the park. (Ex. 4.) The Court notes that the young man was later identified as Aldama Perez and the young woman as Hinojosa Ramos. The couple walked by Almazan to go to another part of the playground. He also saw "the two boys" arrive at the park. He could not see the younger male's face "because he was wearing a sweat shirt with a hood, and this sweat shirt has beige color in the chest and with brown sleeves, and with a sign in the chest." He saw the two males approach Aldama Perez and Hinojosa Ramos and kick and hit Aldama Perez, who apparently tried to defend himself by kicking and hitting the two assailants. Hinojosa Ramos told the two males to leave Aldama Perez alone. Almazan saw both males keep hitting Aldama Perez; Almazan heard Aldama Perez scream, then saw him stumble and fall on his back. Hinojosa Ramos, according to Almazan, then left the playground, but Almazan saw the male "with the sweat shirt with a hood" catch up to Hinojosa Ramos. Almazan and his two friends

4

then went to where Aldama Perez was lying on the ground and found he had blood on his chest. They called for help. After the police arrived, officers showed a detained individual to Almazan and his friends. Almazan identified him as the older of the two males who had attacked Aldama Perez. (This person is named in the Mexican charging documents as Erik Francisco Torres Moreno.)

The second juvenile was Jose Margarito Veliz Dominguez, and he gave a similar statement to police with a similar description of the two assailants. (Ex. 5.) He recalled that one of the two had a knife in his hand, but could not say which one. The third juvenile was Gabriel Lozano Rodriguez and his statement was consistent with those of Almazan and Dominguez. (Ex. 6.)

Also before the magistrate judge in the extradition proceeding was the police investigative report. (Ex. 10.) It notes that the police found, near the park where Aldama Perez was slain, a knife with blood stains and a hooded sweatshirt "in two shades of brown."

Finally, photographic identifications by Dominguez and Rodriguez were included in the extradition file. (Ex. 11 & 12.) They were presented with photographic arrays in November 2011 and they identified Leonardo Ramos Lucero as one of the two assailants of Aldama Perez.

### III. Analysis

Lucero does not take issue with either the jurisdiction of the magistrate judge who conducted the extradition hearing or whether the offense charged is a properly extraditable offense under the governing treaty. He focuses his objection entirely upon the determination of probable cause. More particularly, he argues, first, that he is not the person sought by Mexico and, second, that competent evidence does not establish he committed the crime of homicide. (Pet. 5.) The analysis of these two arguments effectively merges them into one issue since the

person Mexico wants to extradite is the person who committed the homicide—and Lucero does not argue that a homicide did not occur.  Consequently, if the magistrate judge justifiably found probable cause to believe that Petitioner was one of the killers, then probable cause also exists to believe that he is the person to be extradited.  This Court's task is to decide whether "any evidence" supports the determination of probable cause by the magistrate judge.

Petitioner claims he is Leonardo Ramos, not Leonardo Ramos Lucero who is sought by Mexican authorities.  The magistrate judge found otherwise, and the Court concludes that determination is supported by competent evidence.  Petitioner is currently serving a federal sentence imposed in the Northern District of Oklahoma; he is assigned to the Federal Correctional Institution in Cumberland, Maryland.  (Pet. 1.)  He asserts the federal presentence report in that case showed his name as Leonardo Ramos and his date of birth as December 5, 1982, contrary to the extradition request showing his name as Leonardo Ramos Lucero and a birthdate of May 12, 1982.  The presentence report, also, according to Petitioner, did not list him as having a half-sister, Roxana Adelina Hinojosa Ramos (Pet. 5), who implicated him in the killing of Aldama Perez.  He has not provided a copy of that report to the Court in this habeas proceeding, in which, it must be remembered, he has the burden of proof.  But the Court assumes *arguendo* that his assertions about its contents are so.  Even so, the Court has reviewed the entire file in the extradition case and concludes these minor discrepancies do not negate probable cause.

Lucero has focused on two points that may easily be explained by cultural customs.  For example, as to Lucero's argument about his name, the Court notes that in Dominguez's statement, he referred to his two friends as "Francisco Geovany Arellano and Gabriel Lozano." His friends both have an additional surname, but Dominguez obviously did not feel it necessary to use their additional surnames in referring to them.  Rodriguez's statement likewise refers to

6

Dominguez as "Jose Margarito Veliz" and to Almazan as "Giovanny Arellno [*sic*]." Even the prosecutor is variously referred to as "Juan Carlos Avila Martinez" and "Juan Avila." (*Compare* Ex. 1 *with* Ex. 10.) Whether Petitioner is referred to as Leonardo Ramos Lucero or as Leonardo Ramos does not seem to make a critical difference in his identity. A similar question confronted the Supreme Court in *Fernandez*, but the Court rejected the argument out of hand: "The warrant is said to be bad because it names Mariana Viamonte, and not Mariana Viamonte Fernandez, the appellant. He is named both ways in the proceedings and is identified by testimony. There is nothing in this objection, if a warrant is required." 268 U.S. at 313.

As for the difference in birthdates, Respondent has pointed out that the format of dates in the United States is different from that employed in Mexico. (Mem. 16-17.) Indeed, this contention is borne out by looking at the original extradition papers in Spanish, in which dates written as day/month/year are translated in the English version to month/day/year. Whether the birthdate is, in English, 5/12/1982 or, in Spanish, 12/5/1982—or vice versa—is a fact that may be sorted out by the Mexican courts. Neither the difference in name nor the difference in birthdate is sufficient to defeat the determination of probable cause.

Lucero's last argument is that the photographic identifications by the two juvenile witnesses were impermissibly suggestive and, since Hinojosa Ramos was never asked to make a photographic identification of her half-brother, no competent evidence connects him with the crime. (Pet. 6-8.) This argument attempts to import into the probable cause determination required to certify an extradition the question of admissibility of a photographic identification at a federal criminal trial. The former does not depend upon the latter. "An identification does not fail to constitute competent evidence merely because the required procedures for admissibility . . . were not followed." *Quinn v. Robinson*, 783 F.2d 776, 815 (9th Cir. 1986). As the Fourth Circuit has noted:

> [I]n light of the limited nature of the extradition hearing, "certain evidentiary showings inadmissible at trial will be admitted." For example, courts have consistently concluded that hearsay is an acceptable basis for a probable cause determination in the extradition context. Unsworn statements can be sufficient to support a probable cause determination. And, the Federal Rules of Evidence do not even apply to proceedings under [28 U.S.C.] § 3184. *See* Fed. R. Evid. 1101(d)(3).

*Haxhiaj*, 528 F.3d at 292 (case citations omitted). *See also Atuar v. United States*, 156 F. App'x 555, 562 (4th Cir. 2005) (unpublished) (extradition hearings are not criminal proceedings and neither Rules of Criminal Procedure nor Rules of Evidence are applicable to them). Although federal courts are not required in extradition hearings to employ the standards used to determine trial admissibility of witness identifications, it is still necessary to base probable cause on evidence deemed to be "sufficiently reliable and of sufficient weight to warrant a given conclusion." *In re Extradition of Cervantes Valles*, 268 F. Supp. 2d 758, 773 (S.D. Tex. 2003).

Lucero attempts to pick out fine points in the two photographic identifications and to argue, consequently, they are insufficiently reliable. Thus, he contends that a vacuum of evidence exists as to the context of the identifications, such as conversations between witnesses and law enforcement authorities, and such evidence *may* have tainted the procedures. (Pet. 7.) The Court will not speculate on what might have happened and, certainly, will not deem the identifications insufficiently reliable based on rank speculation. All of his objections—including what clothing he was wearing in the photograph,[1] whether Dominguez and Rodriguez were able to see clearly Lucero's face at the time of the crime, and what effect the lapse of more than five years between the crime and the identifications had on the worth of the identifications—are

---

[1] The photographic arrays are reproduced in black and white in the extradition request. It is noted that the copies of the arrays included in the original Spanish documents are of better quality than those in the English translation. Lucero argues that the arrays were presented to the witnesses in color and that he was "wearing an orange jumpsuit of the type worn by detained prisoners." (Pet. 4.) Although the color of prison clothing may be a fact familiar to Petitioner's counsel, no evidence has been offered that the witnesses knew anything at all about prison garb. Furthermore, the photographs are essentially "head shots," showing very little of the clothing worn by those included in the array. For all that the Court can discern, others in the array may also be wearing clothing "of the type worn by detained prisoners."

matters that can be addressed in the Mexican courts.  The magistrate judge is entrusted with the duty to weigh the evidence, including the credibility of witness identifications, and the Court can find no room for disturbing his judgments accepting Dominguez's and Rodriguez's identifications.

In addition, Lucero provides no reason his half-sister *should* have been asked to make a photographic identification of him.  Maybe that would have been icing on the cake, so to speak, but the lack of a photographic identification by her of him does not undermine her certain linking him to the homicide.  Nor does it undermine the other evidence connecting him to the crime.

### *IV.  Conclusion*

The Court concludes that competent evidence provided reasonable grounds for the extradition certification order.  Accordingly, by separate order, the petition for writ of habeas corpus will be denied.

DATED this 6th day of October, 2014.

BY THE COURT:

/s/
James K. Bredar
United States District Judge